[Civ. No. 36342. First Dist., Div. One. Jan. 5, 1977.]

JAMES EDWARD SANDERS, Plaintiff and Respondent, v.
ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY,
Defendant, Cross-complainant and Appellant;
SPOKANE FLOUR MILLS COMPANY, Defendant,
Cross-complainant and Appellant;
TRANSCO, INC., Cross-defendant and Appellant.

634

## COUNSEL

Hardin, Cook, Loper, Engel & Bergez and Ralph A. Lombardi for Defendant, Cross-complainant and Appellant Atchison, Topeka & Santa Fe Railway Company.

Berry, Davis & McInerney and Robert M. Davis for Defendant, Cross-complainant and Appellant Spokane Flour Mills Company.

Hanna, Brophy, MacLean, McAleer & Jensen and Donald R. Brophy for Cross-defendant and Appellant.

No appearance for Plaintiff and Respondent.

## OPINION

SIMS, J.—Transco, Inc., the manufacturer of a railroad boxcar divider door, the Atchison, Topeka & Santa Fe Railway Company, the owner of the boxcar in which the divider door was installed, and Spokane Flour Mills Company, the shipper that last used the boxcar, have each appealed from a judgment entered following a trial on the respective cross-complaints for indemnity of the railroad and the shipper. The judgment apportioned among them the net amount of the damages[1] against the shipper to an employee of the consignee of the shipment who was injured when the divider door fell on him as he prepared to unload the boxcar. The manufacturer and the railroad have also each appealed from an earlier judgment, entered following the trial of the principal action, which reflects the jury's finding, in response to a special interrogatory, that the negligence of the shipper was passive, and from orders which denied their respective motions for judgment notwithstanding the verdict in connection with that earlier judgment.[2]

---

[1] At the pretrial hearing the attorney for the Santa Fe announced that the plaintiff's claim against his client and three other railroads had been settled. It appears that $70,000 was paid under this settlement and deducted from the ultimate verdict which awarded $250,000 in damages. The remaining $180,000 together with interests, costs and attorneys' fees is the subject of this appeal.

[2] At the time of announcing the settlement (fn. 1), the Santa Fe moved that trial on the issues raised by the cross-complaints be severed. That motion was denied. The record reflects the following stipulation in the minutes, "Challenges are to be exercised by [attorney for plaintiff] and [attorney for Spokane] only. Respective Counsel stipulate that the cross-defendants waive any right to jury selection by exercising of challenge and that will apply even if the Court seeks a special interrogatory from the Jury to the Jury concerning active or passive negligence for the purpose of indemnification. Respective Counsel stipulate under Section 592 C.C.P. as to order of proof, to wit, matter proceeds to Jury Trial on factual issue of Plaintiff Sanders vs. Defendant Spokane; if general verdict is in favor or [sic] Plaintiff, there will be special interrogatories to Jury as to passive or active negligence; if then verdict is passive negligence, Court proceeds without jury as to legal matters involving contribution [sic]." Thereafter the court permitted the manufacturer and the railroad, who had not participated in the jury trial on the merits, to introduce further evidence concerning the cause of the accident.

The manufacturer and the railroad contend that the evidence reflects that the shipper was actively negligent as a matter of law, whereas, the shipper contends that the verdict and a finding that its negligence was passive are sustained by the evidence. The manufacturer and the shipper assert that the evidence sustains the findings concerning the negligence of the railroad, and that such negligence, contrary to the position of the railroad, was active and was a proximate cause of the injuries to the plaintiff. The shipper and the railroad claim, with respect to the manufacturer's appeal, that the evidence supports the findings of the trial court which reflect negligence on the part of the manufacturer contributing to the accident.

The court apportioned the net damages of $180,000 in the ratio of $100,000 to the railroad, $40,000 to the shipper, and $40,000 to the manufacturer. The railroad and the shipper contest this apportionment as inconsistent with established principles of implied indemnity. The shipper claims to be entitled to full indemnity, and the railroad asserts that the manufacturer should share equally with it if the other findings are sustained. The manufacturer defends the principle of equitable apportionment insofar as it is found responsible to indemnify or to contribute.

It is concluded that the trial court erred in apportioning the damages under the law in effect at the time of trial; that there is sufficient evidence to sustain the finding that the negligence of the shipper was passive, but that other findings and conclusions of the court are inconsistent with that finding; that there is sufficient evidence to sustain the findings that the railroad was negligent and that its negligence was a proximate concurring cause of the accident; and that there was insufficient evidence to impose liability on the manufacturer. The final judgment must be reversed. The other appeals are dismissed as there was no final judgment or order from which to appeal.

I

We first approach the issue of apportionment of liability because it goes right to the heart of the judgment. The railroad filed its "Cross Complaint for Declaration [*sic*] Relief " in which it alleged that there was an actual controversy between it and the manufacturer concerning the latter's liability for any alleged injuries sustained by the plaintiff. It requested a declaration that the manufacturer was liable "in implied indemnity" for any judgment plaintiff might obtain against the railroad.

In a second cause of action the railroad alleged that its negligence, if any, in purchasing the door was passive, and the manufacturer's negligence in manufacturing the door was active. The manufacturer denied the material allegation of the railroad's cross-complaint other than the sale and purchase of the door, and alleged acts of negligence on the part of the railroad. The shipper in its cross-complaint alleged that the railroad and the manufacturer were negligent in furnishing a defective car, and that it was guilty of no active negligence. It sought a carry-over judgment for any amount that might be awarded to plaintiff and against it. The railroad answered, denying its negligence and asserting the active negligence of the shipper. The manufacturer did likewise.

It clearly appears that the parties were proceeding under the theory of implied indemnity. ■ "Indemnity may be defined as the obligation resting on one party to make good a loss or damage another party has incurred. [Citation.]" (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97].) In this case we are not concerned with any contract of indemnity. ■ The claims of the shipper and the railroad must rest on "the principle of implied indemnity, which permits one of two tortfeasors to shift the entire loss to the other when, without active fault on the claimant's part, he has been compelled by reason of some legal obligation to pay damages occasioned by the immediate fault of the other. As a rough rule of thumb, the decisions allowing indemnity speak of the 'passive' fault of the claimant as compared with the 'active' fault of the indemnitor. Standing alone, the passive-active fault criterion is too vague to serve as a decisional guide. The standard most frequently applied by the California appellate courts is one drawn from an opinion of the Pennsylvania Supreme Court in *Builders Supply Co.* v. *McCabe*, 366 Pa. 322, 325-326 [77 A.2d 368, 24 A.L.R.2d 319]: 'The right of *indemnity* rests upon a difference between the primary and secondary liability of two persons each of whom is made responsible by the law to an injured party. . . . The difference between primary and secondary liability is not based on a difference in *degrees* of negligence or on any doctrine of *comparative* negligence,—a doctrine which, indeed, is not recognized by the common law. . . . It depends on a difference in the *character* or *kind* of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrongdoers to the injured person. . . . But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a

defect or remedy a dangerous condition caused by the act of the one primarily responsible.' " (*Ford Motor Co.* v. *Robert J. Poeschl, Inc.* (1971) 21 Cal.App.3d 694, 696-697 [98 Cal.Rptr. 702] [fn. collecting cases applying the Pennsylvania formulation omitted]. See also *Bill Loeper Ford* v. *Hites* (1975) 47 Cal.App.3d 828, 832 [121 Cal.Rptr. 131]; *General Electric Co.* v. *State of Cal.* ex rel. *Dept. Pub. Wks.* (1973) 32 Cal.App.3d 918, 921-923 [108 Cal.Rptr. 543]; *Standard Oil Co.* v. *Oil, Chemical etc. Internat. Union* (1972) 23 Cal.App.3d 585, 588 [100 Cal.Rptr. 354]; *Pearson Ford Co.* v.. *Ford Motor Co.* (1969) 273 Cal.App.2d 269, 271-273 [78 Cal.Rptr. 279]; *Atchison, T. & S. F. Ry. Co.* v. *Lan Franco* (1968) 267 Cal.App.2d 881, 885-887 [73 Cal.Rptr. 660]; *Ferrel* v. *Vegetable Oil Products Co.* (1966) 247 Cal.App.2d 117, 120-121 [55 Cal.Rptr. 589]; *Herrero* v. *Atkinson* (1964) 227 Cal.App.2d 69, 74 [38 Cal.Rptr. 490, 8 A.L.R.3d 629]; and *Cahill Bros., Inc.* v. *Clementina Co.* (1962) 208 Cal.App.2d 367, 380-382 [25 Cal.Rptr. 301]. Note, *Contribution and Indemnity* (1969) 57 Cal.L.Rev. 490; and Molinari, *Tort Indemnity in California* (1967) 8 Santa Clara Law. 159.)

■ There is a well recognized distinction between indemnity and contribution. In *Herrero* v. *Atkinson, supra,* the court observed, "It is important to note that both cross-complaints seek indemnity and not contribution. There is a distinction between the two rights. Indemnity seeks to transfer the entire loss imposed upon one tortfeasor to another who in justice and equity should bear it. Contribution distributes the loss equally among all tortfeasors, each bearing his pro rata share. (Code Civ. Proc., §§ 875, 876; *Cahill Bros., Inc.* v. *Clementina Co.,* 208 Cal.App.2d 367, 376 . . . ; Prosser, Torts, p. 249.) Where one tortfeasor is entitled to indemnity from the other, the right of contribution does not exist. (Code Civ. Proc., § 875, subd. (f).)" (227 Cal.App.2d at pp. 73-74. See also *General Electric Co.* v. *State of Cal.* ex rel. *Dept. Pub. Wks., supra,* 32 Cal.App.3d 918, 925-926; and *Atchison, T. & S. F. Ry. Co.* v. *Lan Franco, supra,* 267 Cal.App.2d 881, 884-885.) It is clear that in this case the shipper is not entitled to contribution. As a condition to contribution there must be a money judgment rendered jointly against two or more defendants. (Code Civ. Proc., § 875, subd. (a); *General Electric Co.* v. *State of Cal.* ex rel. *Dept. Pub. Wks., supra,* 32 Cal.App.3d 918, 925-926.) Moreover, even among judgment debtors, when one tortfeasor is entitled to indemnity from another, he is not entitled to contribution. (Code Civ. Proc., § 875, subd. (f); *Herrero* v. *Atkinson, supra,* 227 Cal.App.2d 69, 73-74.)

■ It would appear, therefore, that if the shipper was in fact passively negligent or otherwise entitled to implied indemnity, and if

either the manufacturer or the railroad was actively negligent, or otherwise primarily responsible, the shipper should have been relieved of all of the burden of the judgment. Likewise, if, under those circumstances, the manufacturer and the railroad were concurrently negligent in the same degree, they each should be equally responsible for the indemnification of the shipper.

At the time fixed for argument on the equitable issues arising out of the cross-complaints for indemnity, the court asked for an expression of opinion concerning the interplay of contribution as opposed to indemnity. The attorneys for the shipper and manufacturer each pointed out that contribution only applied to joint judgment debtors, and the attorney for the railroad agreed that the question was strictly one of indemnity. At a further hearing, after the parties had argued the indemnity issue, the judge secured concurrence that $180,000 was involved, and that it was not to concern itself with the $70,000 paid by the railroads, including Santa Fe. He also manifested his intention to apportion the amount involved, and he stated, "I will tell you this much. I am not going to exonerate Spokane completely." Nevertheless he also stated, "First, I don't feel that Spokane was affirmatively negligent. I think there was passive negligence in the light of the Authorities that we have had presented." He added that he contemplated that the railroad pay 60 percent of the total judgment, with credit for what it paid, and that the manufacturer and shipper each pay 20 percent. The matter was continued for further consideration. At that hearing the attorney for the shipper cautioned against an apportionment. Subsequently the manufacturer requested an apportionment of the $180,000 if it was to be held liable. The court ordered that sum divided $100,000 against the railroad and $40,000 each to the manufacturer and shipper.[3] Although it appears that the court was seeking a stipulation to the apportionment there was no consent by the shipper or the railroad.

The manufacturer seeks to justify the apportionment on general equitable principles. It notes that the cases refer to "equity and good conscience" (see *Herrero v. Atkinson, supra,* 227 Cal.App.2d 69, 74; and Molinari, *Tort Indemnity in California, supra,* 8 Santa Clara Law. 159,

---

[3] In the discussion it was established that by the sum of $70,000 paid by the railroads, $30,000 had been paid by Santa Fe, $17,500 each by Northern Pacific and Union Pacific, and $5,000 by Western Pacific, subject, however, to arbitration of the proper share if requested by any of those contributing. On that basis it appeared that $210,000 of the $250,000 judgment involved the Santa Fe and the shipper. On a 60-20-20 basis, it computed to $96,000 ($126,000 less $30,000 paid) for the railroad, and $42,000 each for the manufacturer and shipper.

160 and 166); that there has been criticism of the court-made tests of primary and secondary liability or active and passive fault (see *Ford Motor Co.* v. *Robert J. Poeschl, Inc., supra,* 21 Cal.App.3d 694, 696-697; and *Atchison, T. & S. F. Ry. Co.* v. *Lan Franco, supra,* 267 Cal.App.2d 881, 886-887); and that a federal court has taken a more liberal approach to apportionment (*United Air Lines, Inc.* v. *Wiener* (9th Cir. 1964) 335 F.2d 379). A reading of the authorities upon which the manufacturer relies reflects that in this state the courts have adhered to the theory that the equitable considerations must establish a right to shift the liability, and that apportionment is not authorized. We have consistently refused to apply the principle which the manufacturer states it finds in the *United Air Lines* case. (See *General Electric Co.* v. *State of Cal.* ex rel. *Dept. Pub. Wks., supra,* 32 Cal.App.3d 918, 924-925; *Standard Oil Co.* v. *Oil, Chemical etc. Internat. Union, supra,* 23 Cal.App.3d 585, 590-591; and *Atchison, T. & S. F. Ry. Co.* v. *Lan Franco, supra,* 267 Cal.App.2d 881, 887-889.)

In *General Electric Co., supra,* the court declined to adopt and apply a rule that would equitably apportion the injured person's damages between several tortfeasors according to their respective fault, stating, "It would create but another species of contribution between joint tortfeasors, contrary to the dictates of Code of Civil Procedure section 875, and the related authority (cited *ante*) holding that the common law rule of no contribution must apply in cases not covered by the statute." (32 Cal.App.3d at p. 926.) It has frequently been recognized that indemnity is distinguishable from any liability imposed on the basis of comparative negligence, and that contribution was not available at common law. (See *Taggart* v. *State of California* (1975) 45 Cal.App.3d 768, 771 [119 Cal.Rptr. 696]; *Ford Motor Co.* v. *Robert J. Poeschl, Inc., supra,* 21 Cal.App.3d 694, 697; *Atchison, T. & S. F. Ry. Co.* v. *Lan Franco, supra,* 267 Cal.App.2d 881, 888. Note also *Gardner* v. *Murphy* (1975) 54 Cal.App.3d 164, 168 [126 Cal.Rptr. 302].)

■ It is now contended that the adoption of the principle of comparative negligence in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226], requires approval of the trial court's action. There the court recognized that its decision exposed considerations of a practical nature, which it disposed of by adopting a mandate granting the trial judges broad discretion in adopting such procedures as may accomplish the objectives and purposes expressed in its opinion (see 13 Cal.3d at pp. 823-827). The court stated: "The most serious of these considerations are those attendant upon the administration of a rule of

comparative negligence in cases involving multiple parties. One such problem may arise when all responsible parties are not brought before the court: it may be difficult for the jury to evaluate relative negligence in such circumstances, and to compound this difficulty such an evaluation would not be res judicata in a subsequent suit against the absent wrongdoer. Problems of contribution and indemnity among joint tortfeasors lurk in the background. [Citations.]" (*Id.,* p. 823.) It noted, "Two of the indicated areas (i.e., multiple parties and willful misconduct) are not involved in the case before us, and we consider it neither necessary nor wise to address ourselves to specific problems of this nature which might be expected to arise." (*Id.,* p. 826.)

The mandate to adopt new procedures expressed on March 31, 1975, cannot control the judgment entered November 6, 1973. In *Li,* the court expressly ruled, ". . . we hold that the present opinion shall be applicable to all cases in which trial has not begun before the date this decision becomes final in this court, but that it shall not be applicable to any case in which trial began before that date (other than the instant case)—except that if any judgment be reversed on appeal for other reasons, this opinion shall be applicable to any retrial." (*Id.,* p. 829. See *Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 370, fn. 2 [131 Cal.Rptr. 78, 551 P.2d 398]; and *Venzor* v. *Santa Barbara Elks Lodge, No. 613* (1976) 56 Cal.App.3d 209, 213-214 [128 Cal.Rptr. 353]. Note, *Burlingame Motor Co.* v. *Peninsula Activities, Inc.* (1971) 15 Cal.App.3d 656, 664 [93 Cal.Rptr. 376].)

We conclude that the court erred in failing to apply the law in effect at the time of the judgment. The effect of this error will be examined after consideration of the other issues raised by the parties. (See part V below.)

## II

The manufacturer's and the railroad's contention that the shipper is barred from recovering any indemnity because its negligence was active runs headlong into the substantial evidence rule. The jury returned a verdict that the negligence of the shipper was passive. Then, after the parties involved in this appeal presented further evidence in a five-day court trial, the court made the following finding: "Spokane was passively negligent in failing to discover the defective condition of the door and supporting structure, which defective condition resulted in the injuries to Sanders." Moreover, the shipper contends that the court erroneously

permitted the railroad and the manufacturer to introduce further evidence on the issues raised by the cross-complaint.

After the jury returned its verdict awarding the plaintiff $250,000 against the shipper, the attorneys for the manufacturer and the railroad were notified and appeared in court. They reviewed the stipulation (see fn. 2 above). The shipper offered to waive a jury but later acceded to the court's position that the jury should decide whether its negligence was active or passive. The manufacturer took the position that the verdict could only have been predicated upon active negligence, but proposed instructions to be used if the matter was to be submitted to the jury. Over the objection of the shipper the court indicated it would hear further evidence on the issues tendered by the cross-complaint. The railroad offered to waive submission of the interrogatory, but also offered instructions on the subject if it were to go to the jury. The jurors were instructed and given a special verdict. After a period of deliberation they asked the court, "Your Honor, does the mere physical connection with the act establish activeness? [¶] In other words, if the jury believes that Spokane placed a defective door in position, whether they knew it was defective or not, does the physical connection establish activeness, or is more proof required under the law?" The instructions were reread. They contained the following sentence: "Accordingly, if a person participates in an affirmative act of negligence, or is physically connected with an act or omission by knowledge or acquiescence on his part, he is deemed to have been actively negligent." Ten minutes later the jury brought in the following verdict: "We, the Jury in the above-entitled cause find that the negligence of Spokane Flour Mills Company was passive."

When the parties reconvened to try the issues raised by the cross-complaints, the shipper again insisted that the matter should be determined by the court on the evidence produced at the trial on the injured plaintiff's claim, and that the sole question for decision was whether that evidence showed that the railroad and manufacturer were, or either of them was, negligent. The court ruled as follows: ". . . I think we should proceed on the evidence on the contribution indemnification issue. [¶] The jury has ruled that Spokane Flour Mills Company was not actively negligent. [¶] We still have to get evidence before the Court to decide the issue of indemnification. [¶] And to the extent that it is necessary to make such a ruling, I will rule that additional evidence may be produced on behalf of the cross-complainants. [¶] There just isn't enough evidence before the Court at this time to make an intelligent decision on the contribution." The shipper then submitted its case on the

evidence before the court. The cross-defendants did not object to the consideration of that evidence. Despite the shipper's insistence that any inquiry into the question of the nature of the shipper's negligence was foreclosed and the cross-defendant's insistence that it was not, no definite ruling was made by the court at that time. The judge observed, "The jury has found that you [the shipper] were not actively negligent, but I think we should get complete evidence so we know just what happened here and why it happened."

On appeal the shipper again suggests that in view of the original stipulation, and the proceedings taken to secure the jury's answer to the special interrogatory, the court erred in receiving further evidence. We agree with the manufacturer that the cross-defendants were entitled to have their day in court. It was one thing to deny a motion for bifurcation when all the cross-defendants, except the manufacturer were joined as defendants in the original action, but quite a different situation when they had settled and were out of the principal case. By postponing the determination of the issues raised by the cross-complaint, the shipper gained the advantage, despite the fact it failed to prove such, of attempting to shift the blame for the accident on parties, the railroad and the manufacturer, who were not before the court and not contesting his attempts to do so. It is true that the stipulation, as so construed, gave the cross-defendants two opportunities to establish that the shipper's negligence was active, but the shipper was not prejudiced thereby, any more than it would have been had the cross-defendants made, and the court had denied, a motion for nonsuit on the evidence presented at the jury trial. Moreover, we note that it would have been within the court's discretion to grant the cross-defendants a new trial if they were in fact bound by the verdict. We, therefore, approach the issue of the nature of the shipper's negligence with a consideration of all of the evidence at both trials.

The following rules govern our review of the evidence in connection with the findings of the trial court not only with respect to the negligence of the shipper, but also with respect to the negligence of the railroad and the manufacturer.

"Whether conduct constitutes active or passive negligence depends upon the circumstances of a given case and is ordinarily a question for the trier of fact; active negligence may be determined as a matter of law, however, when the evidence is so clear and undisputed that reasonable persons could not disagree. [Citations.]" (*Rossmoor*

*Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d 622, 629. See also *Herman Christensen & Sons, Inc.* v. *Paris Plastering Co.* (1976) 61 Cal.App.3d 237, 251 [132 Cal.Rptr. 86]; *Ford Motor Co.* v. *Robert J. Poeschl, Inc., supra,* 21 Cal.App.3d 694, 698; *Pearson Ford Co.* v. *Ford Motor Co., supra,* 273 Cal.App.2d 269, 275; and *Cahill Bros., Inc.* v. *Clementina Co., supra,* 208 Cal.App.2d 367, 381.)

■ In *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875 [92 Cal.Rptr. 162, 479 P.2d 362], the court emphasized the following principles: " 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231], other citations omitted.) [¶] 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' (*Tesseyman* v. *Fisher* (1952) 113 Cal.App.2d 404, 407 [248 P.2d 471], other citations omitted.)" (3 Cal.3d at p. 881. See also *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Herman Christensen & Sons, Inc.* v. *Paris Plastering Co., supra,* 61 Cal.App.3d 237, 253; and *Southern Pac. Co.* v. *Unarco Industries, Inc.* (1974) 42 Cal.App.3d 142, 150 [116 Cal.Rptr. 847].)

The findings show that the Santa Fe railroad car in which the load divider was installed was received by the shipper on or about April 24, 1968, was loaded by the shipper, and dispatched to its destination the Oakland Naval Supply Depot, where it arrived May 2, 1968. The accident occurred when the door fell on an employee of the supply depot as he was attempting to open it and move it so as to unload the car. The load divider door in question was manufactured pursuant to specifications formulated by the railroad. The door itself is suspended from a carriage beam which traverses the width of the car. At both ends of the cross beam are wheels, smoothed on one end and grooved on the other. At one end of the beam there is an outrigger with two wheels which serves to keep the beam perpendicular to the side of the car. The wheels run lengthwise in the car on upper keeper tracks. There are also lower keeper tracks, but the door does not rest on them. When placed to secure a partial load the door is locked in place by pins, and at the same time the carriage beam is relieved of the weight of the door, which is then secured at each end of the lower and upper ends by pins. When the door is unlocked by lifting a lever, the four corner pins retract and the door then hangs by a swivel in the carriage beam.

When the accident occurred the injured workman and his coworker could not at first release the pins. Believing the load had forced itself against the door, they attempted to loosen it with a crowbar. When it appeared to be loosened the injured worker pulled the door lever, and instead of swinging free on the cross beam, it fell with the cross beam attached. After the accident it was discovered that the outrigger axles did not have wheels on them and the wheels were found in the car.

The manufacturer contends that the shipper was actively negligent because the physical evidence requires a finding not only that the door was in a defective condition at the time the car was loaded and it was secured, but also that it must have been malfunctioning at that time to the extent that the shipper would have known of the defective condition. This postulate rests on the premise that the door could not fall at the time it was unlocked unless the weld which held the wheels on the outrigger axles was broken, and the carriage beam without the guidance and locking of the wheels came off the keeper track. That much may be conceded. It further claims that the evidence shows that the weld had been broken by the application of force of great magnitude and the break was not of a nature which would be caused by ordinary wear and tear. It further asserts the condition of the wheels, and their position after the accident, showed that they had been off some time. It is therefore concluded that the cross beam and door were not sustained by the wheels when the car was loaded, and that of necessity the shipper must have discovered the defect and used excessive force to place the wheelless door into position, thereby creating a situation in which the carriage beams, not held in place by the wheels locked in the keeper track, could shift and fall when unlocked. The railroad's argument parallels that of the manufacturer. It adds that the relative position of the door, the carriage beam and outrigger, and the detached wheels after the accident, indicates that the door must have been locked in place backwards.

The shipper offered evidence which tended to show that the car would not have been accepted for loading if there had been any noticeable defect in the door or if such a defect had developed, but that it would have called for another car. It also claimed a practice of checking the divider doors by manually moving them. Evidence showed that it would be necessary to get a ladder and a light to inspect the condition of the wheels in the keeper tracks and the condition of the mechanism which attached them to the carriage beam. Testimony was adduced that the wheels may still have been on the axles supporting the carriage beam despite the fact the weld which held them in that position was broken,

and that the beam could pull out. The shipper claimed it did not have the equipment or the manpower to force the door in place as the cross-defendants asserted was done. The record also shows that the car had been inspected by an intermediate carrier five days before it was delivered to the shipper, and at that time was certified as free from defects. Testimony indicated that government inspectors inspected the shipment before it left the shipper's premises.

The inquiry was handicapped because after photographing the divider door involved it was subsequently lost by the railroad. Moreover, the delay in making the shipper a party as an original fictitious defendant, made it difficult for it to pin down just what occurred in connection with the loading of the car. The physical facts tend to support the theories advanced by the cross-defendants. ▇ Nevertheless, it does not appear as a matter of law that the jury and the trial judge could not, in reliance on the evidence produced in support of the shipper's theory, find it was passively negligent.

In *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* the court deferred to the determination of the trier of fact that the indemnitee was passively negligent. The court observed, "Passive negligence is found in mere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty imposed by law. [Citations.] Active negligence, on the other hand, is found if an indemnitee has personally participated in an affirmative act of negligence, was connected with negligent acts or omissions by knowledge or acquiescence, or has failed to perform a precise duty which the indemnitee had agreed to perform. [Citations.] 'The crux of the inquiry is to determine whether there is participation in some manner by the person seeking indemnity in the conduct or omission which caused the injury beyond the mere failure to perform a duty imposed upon him by law.' (*Morgan* v. *Stubblefield, supra* [(1972) 6 Cal.3d 606 (100 Cal.Rptr. 1, 493 P.2d 465)], at p. 625.) [¶] . . . Passive negligence has been found or assumed from the failure to discover a defective condition created by others [citation], failure to exercise a right to inspect certain work and specify changes [citation], and failure to exercise a supervisory right to order removal of defective material [citation]. Active negligence has been found in digging a hole which later caused an injury [citation] knowingly supplying a scaffold which did not meet the requirements of a safety order [citation], creating a perilous condition that resulted in an explosion [citation], and failing to install safety nets in violation of a contract [citation]." (13 Cal.3d at pp. 629 and 630.) The conflict in this case is highlighted by *Pearson Ford Co.* v. *Ford*

*Motor Co., supra,* 273 Cal.App.2d 269. There the court reversed a judgment which had awarded an automobile dealer full indemnity against the manufacturer in an action in which both had been found liable for damages for personal injuries proximately caused by defective brakes. The court distinguished between the dealer's liability as a mere dealer and as a garageman who had worked on the brakes, as follows: "If the terms 'active' and 'passive' negligence must be used in making the determination upon which the right to indemnity is based, then the cases we have reviewed above require a distinction to be made. Acting solely as the retailer of the automobile, Pearson's negligence, if any, in failing to discover the brake defect would be 'passive negligence,' and as such, would not defeat its right to indemnity. In this instance, however, having gone beyond the duty imposed upon it by law, i.e., as retailer of the car, and having undertaken the repair of a part of the car closely associated with and inextricably related to the brake defect, Pearson's failure to discover the defect would be 'active negligence,' if, under all the circumstances and in the exercise of ordinary care, it should have made that discovery." (273 Cal.App.2d at p. 276. Cf. *Aetna Life & Cas. Co.* v. *Ford Motor Co.* (1975) 50 Cal.App.3d 49, 54 [122 Cal.Rptr. 852], with *Mize* v. *Atchinson, T. & S. F. Ry. Co.* (1975) 46 Cal.App.3d 436, 457 [120 Cal.Rptr. 787]; and *Cahill Bros., Inc.* v. *Clementina Co.* (1962) 208 Cal.App.2d 367, 382-383 [25 Cal.Rptr. 301].) So here there was evidence which would sustain either conclusion.

 Since the shipper was found to be passively negligent the trial court erred under the law then in effect, in apportioning the judgment and denying it full indemnity against the cross-defendants which it also found to be negligent. (See part I above.) The effect of this error is reviewed below (part V).

III

 The trial court found, "11. The fall of the divider door resulted from rugged use *and abuse* to which it and its supporting system had been subjected over a period of time, but Santa Fe and Transco knew that such doors and supporting systems were being subjected to such use because of knowledge of *and abuse and there had been* a number of prior mechanical problems with the doors and supporting systems, including some instances of prior door falls. Regardless of such knowledge, Santa Fe and Transco had failed to either *construct,* redesign or strengthen the doors and supporting system in the car which injured Sanders sufficient to withstand the type of use to which they had reason to believe they

would be subjected, or to give either Spokane or Sanders adequate warning of dangers involved in their use. [¶] 12. Santa Fe and Transco were negligent in failing to correct the cause of door and supporting system failures or to give adequate warning to Spokane or Sanders of the possible dangerous condition of the door and supporting system. [¶] 13. *Santa Fe was also negligent in failing to make provision for periodic inspection of the doors and supporting systems to sufficiently determine whether the grooved wheels which held the doors on overhead tracks were working loose from their axles.*" (Italics indicates interlineations made by the trial judge.)

The railroad does not seriously question that there is sufficient evidence to sustain the foregoing findings. It participated in the design of the doors and tracks, and installed the equipment fabricated by the manufacturer to specifications which it approved. Use of the doors had demonstrated that the failure of shippers to lock the doors in place resulted in damage to the doors while in transit, including failure of the pressure ring which held the wheels on the axle, and failure of the doors to remain on the tracks. The efforts made by the railroad to advise its shippers of the damages to the doors were not comprehensive. It took the position that the failure of a weld caused the carriage beam to separate from the wheels, and the evidence showed that the railroad, rather than the manufacturer, as it claimed, was responsible for having welded the wheels on the axle which held the carriage beam up. There is no question but that the facts so found constituted active negligence. (See *County of Alameda* v. *Southern Pac. Co.* (1961) 55 Cal.2d 479, 484-485 [11 Cal.Rptr. 751, 360 P.2d 327]; *Burlingame Motor Co.* v. *Peninsula Activities, Inc., supra,* 15 Cal.App.3d 656, 660-662; *Cahill Bros., Inc.* v. *Clementina Co., supra,* 208 Cal.App.2d 367, 382-383; and *De La Forest* v. *Yandle* (1959) 171 Cal.App.2d 59, 61 [340 P.2d 52].)

The railroad claims it cannot be liable as an indemnitor because its negligence was not a proximate cause of the injuries. It established that another railroad assumed possession and control of the car in question on March 24, 1968, maintained that possession and control during the month of April, and certified it as in good condition on April 19, 1968, five days before it was delivered to the shipper for loading. In *Whinery* v. *Southern Pac. Co.* (1970) 6 Cal.App.3d 126 [85 Cal.Rptr. 649], we observed, "Of course the railroad company's speed violation alone, although negligence as a matter of law, created no liability. [Citation.] For plaintiffs to recover, such negligence must also have been a proximate cause of the accident and decedent's death. [Citation.]

However, it is well settled that the question of proximate cause, like those of negligence and contributory negligence, becomes one of law where the facts are uncontroverted and only one deduction or inference may reasonably be drawn therefrom. [Citations.]" (6 Cal.App.3d at p. 128. See also, 2 Rest.2d Torts, §§ 430 and 434; Prosser, Law of Torts (4th ed. 1971) § 45, pp. 289-290; and 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 621, p. 2903.)

The railroad contends that as a matter of law it is entitled to rely upon the inspecting carrier's failure to prevent harm as a supervening cause within principles enunciated in subdivision (2) of section 452 of the Restatement Second of Torts, as follows: "(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause." In the comment on subsection (2) the following illustration appears: "9. The A Railroad negligently turns over to its connecting carrier B Railroad a freight car, the door of which is in defective and dangerous condition. B Railroad operates the car on its own line over a period of six months, during which time it negligently fails to inspect the car and discover the defect. At the end of that time it turns the car over to C Railroad. D, who is an employee of C Railroad, without any negligence of his own, is injured when the door falls on him. A Railroad is not liable to D." (2 Rest.2d Torts, at p. 490. See also 4 Witkin, *op. cit.*, § 622, p. 2904.)

On the other hand, we note that the general rule stated in subsection (1) of section 452 of the Restatement reads: "(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm." The comment on subsection (2) points out that it "covers the exceptional cases in which, because the duty, and hence the entire responsibility for the situation, has been shifted to a third person, the original actor is relieved of liability for the result which follows from the operation of his own negligence." In order to apply the foregoing principles it would be necessary to assume that the defect which caused the severance between the wheel and the axle on the carriage beam not only existed at the time of the inspection but also was apparent at that time. Furthermore, it would have to be found that the owner railroad could not reasonably foresee that such inspections might be conducted in a negligent manner.

In this state the guiding principles have been recognized as follows: "The rules set forth in sections 442-453 of the Restatement of Torts for determining whether an intervening act of a third person constitutes a superseding cause which prevents antecedent negligence of the defendant from being a proximate cause of the harm complained of have been accepted in California. [Citations.] [¶] Under these rules the fact that an intervening act of a third person is done in a negligent manner does not make it a superseding cause if a reasonable man knowing the situation existing when the act of the third person is done would not regard it as highly extraordinary that the third person so acted or the act is a normal response to a situation created by the defendant's conduct and the manner in which the intervening act is done is not extra-ordinarily negligent. [Citations.] The fact that a third person does not perform his duty to protect the plaintiff from harm, either because he makes no effort or through his negligence does not succeed, is not a superseding cause. [Citation.]" (*Stewart* v. *Cox* (1961) 55 Cal.2d 857, 863-864 [13 Cal.Rptr. 521, 362 P.2d 345]. See also *Veseley* v. *Sager* (1971) 5 Cal.3d 153, 163-164 [95 Cal.Rptr. 623, 486 P.2d 151]; Prosser, *op.cit.*, § 44, pp. 270-289 *passim*; and 4 Witkin, *op.cit.*, §§ 628, 639 and 641, pp. 2910-2911, 2919-2920 and 2921.)

In view of the degree of danger and the magnitude of the risk of harm from the defect, and its nature and the likelihood of its discovery, we believe the trial court was warranted in rejecting the view that the intervening inspection was such a supervening act as would relieve the railroad. It not only had a duty to maintain the apparatus in its car, but also a duty to redesign and modify it so it would be less dangerous, and a duty to effect repairs in a manner which would render it safe, from liability for injuries proximately resulting from a breach of one of those duties.

The findings of the court with respect to the railroad's negligence, and impliedly finding that such negligence was an active, primary concurring proximate cause of the accident must be sustained.

## IV

The manufacturer contends that there is no evidence to support the findings quoted above (part III) insofar as they include it. It contends that since it manufactured a product which was designed to be locked in place while cars were in transit, and which, according to photographs in evidence, bore clear instructions to lock the doors when not loading or

unloading, it cannot be faulted because shippers and railroads failed to use the product in the manner which was contemplated. (See *Greenman v. Yuba Power Products Co.* (1963) 59 Cal.2d 57, 63, 64 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 468 [150 P.2d 436]; *Dosier* v. *Wilcox-Crittendon Co.* (1975) 45 Cal.App.3d 74, 78 [119 Cal.Rptr. 135]; *Martinez* v. *Nichols Conveyor etc. Co.* (1966) 243 Cal.App.2d 795, 799 [52 Cal.Rptr. 842]; *Erickson* v. *Sears, Roebuck & Co.* (1966) 240 Cal.App.2d 793, 798-800 [50 Cal.Rptr. 143]; and *Ulwelling* v. *Crown Coach Co.* (1962) 206 Cal.App.2d 96, 105-119 [23 Cal.Rptr. 631].) It also contends that any responsibility it otherwise might have had was ended when the railroad undertook to repair and maintain the door, and altered the essential composition of the product furnished by the manufacturer. (See *Erickson* v. *Sears, Roebuck & Co., supra,* 240 Cal.App.2d 793, 800.) It asserts that unlike the manufacturer in *Ford Motor Co.* v. *Robert J. Poeschl, Inc., supra,* 21 Cal.App.3d 694, it had no way of notifying prospective users of its product of hazards which had arisen from abuse of the door after it was installed in the railroad's car. (Cf. 21 Cal.App.3d at pp. 698-699.) Finally, it contends that the railroad had the last clear chance to avert the hazard and therefore it should not be indemnified by the manufacturer and should bear the full burden of indemnifying the shipper, if the latter is entitled to indemnification. (See *Ford Motor Co.* v. *Robert J. Poeschl, Inc., supra,* 21 Cal.App.3d 694, 697 and 699.)

On the other hand the railroad and the shipper contend that there was a duty on the manufacturer to design and fabricate a product that would be safe despite the abuse to which it was subjected. (See *Cronin* v. *J. B. E. Olson Corp.* (1972) 8 Cal.3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Bill Loeper Ford* v. *Hites, supra,* 47 Cal.App.3d 828, 834; *Southern Pac. Co.* v. *Unarco Industries, Inc.* (1974) 42 Cal.App.3d 142, 151 [116 Cal.Rptr. 847]; *Balido* v. *Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633, 640-641 [105 Cal.Rptr. 890]; *Thompson* v. *Package Machinery Co.* (1971) 22 Cal.App.3d 188, 195-196 [99 Cal.Rptr. 281]; *Thomas* v. *General Motors Corp.* (1970) 13 Cal.App.3d 81, 88-90 [91 Cal.Rptr. 301]; and *Varas* v. *Barco Mfg. Co.* (1962) 205 Cal.App.2d 246, 257-258 [22 Cal.Rptr. 737].)

All agree that the evidence shows, as found by the court, "The fall of the divider door resulted from rugged use and abuse to which it and its supporting system had been subjected over a period of time, . . ." There is also evidence to support a further finding that *at the time of the accident,* "Santa Fe and Transco knew that such doors and supporting

systems were being subjected to such use and abuse and there had been a number of prior mechanical problems with the doors and supporting systems, including some instances of prior door falls." The uncontradicted evidence shows that the concept of divider doors was only three or four years old in 1965 and 1966 when the manufacturer produced doors for Santa Fe; that the doors and appendant parts were produced to the railroad's specifications proposed in May 1965; and that the door involved in this case was produced and delivered in 1966, after revisions and changes ordered by the railroad were incorporated. No evidence was offered to show that at that time the manufacturer had knowledge that the doors should have been designed, as is now contended, to withstand the abuse received in transit when unlocked. In the absence of a duty on the manufacturer to construct a door other than as specified by the railroad, and since those specifications did not call for a door which was inherently dangerous, but which could only become so if not properly used, and in the absence of any proof of knowledge of such misuse in 1965, there was no negligence on the part of the manufacturer in 1966, nor any defect in design on its part. The finding that "Transco had failed to construct . . . [a] door and supporting system in the car which injured Sanders sufficient to withstand the type of use to which [it] had reason to believe they would be subjected" is not sustained by the evidence. The finding that "Transco had failed to either redesign or strengthen the doors in the car which injured Sanders . . ." is irrelevant in the absence of any duty on the manufacturer to do so. This is not the case of a defective product which should be repaired or recalled. The mechanical devices were installed by, used by, and maintained and repaired by the railroad. The manufacturer could neither remove the apparatus from the car in question, nor go in and make additions or corrections. The correspondence between the railroad and the manufacturer concerning the need for a stronger product by reason of the abuse to which the doors were subjected might throw some light on future products, but it cannot retroactively create a design defect which was unforseeable at the time of original manufacture and installation. The same comments apply to the finding that Transco was "negligent in failing to correct the cause of door and supporting system failures . . . ."

This case is unlike *Southern Pac. Co.* v. *Unarco Industries, Inc., supra,* upon which the railroad relies. There the dispute was whether the pin, which apparently held the door to the swivel on the carriage beam on a divider door of similar nature was defective in design or material, or whether the cause of the pin's failure was occasioned because the pin had " 'been subjected to loads which must have resulted from the car

having been impacted or moved without the door being secured in place.' " (See 42 Cal.App.3d at p. 148.) Moreover, the action was predicated on breach of contract (written indemnity), and express warranty, as well as strict liability. The issue of the railroad's active or passive negligence was submitted to the jury as was the issue of whether the product was used in a reasonable manner. The court properly upheld the verdict on the evidence before it (*id.,* p. 150). Here, on the other hand, the court expressly found, as was compelled by the uncontradicted evidence, that the defect which caused the accident was caused by the abuse to which the product had been subjected.

The suggestion of the shipper's expert that another car he examined gave rise to the hypothesis that the design was faulty, in that there was a possibility that the tracks would spread, was in no way related to the car in question in this case. Finally, we note that it was established that the immediate cause of the accident was the failure of the weld made by the railroad itself. Since Transco was not a defendant in the action, the railroad's cross-action, like that of the shipper, must depend on a showing that it was not actively negligent. It failed to do so and should not be permitted to shift the responsibility to the manufacturer under principles of implied indemnity. The shipper had the burden of producing evidence to show that the manufacturer as well as the railroad was negligent, and we conclude it failed to do so. The trial court erred in assessing any indemnity against the manufacturer.

## V

The appeal from the "judgment" rendered on the special finding of the jury is of questionable nature. There is no judgment, rather an interlocutory finding. The trial court purported to deny the cross-defendants' motions for judgment notwithstanding that verdict and their accompanying motions for new trial. Nevertheless it in effect gave the cross-defendants a new trial by opening up the matter for further evidence. We note that an action for indemnity is equitable in nature. (See 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 122, p. 5341.) The provisions of the California Constitution then found in article I, section 7 (revised and republished in art. I, § 16, Nov. 5, 1974), as supplemented by section 592 of the Code of Civil Procedure have been interpreted as limiting the right to a jury trial to actions at law. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 78, p. 2912.) It is unnecessary to determine here whether the nature of the rights asserted by the cross-complainants were strictly equitable, or were so quasi-

contractual in nature as to give rise to the right to a jury trial. It suffices to note that the parties had agreed that the issues raised should be tried by the court. The further stipulation that an interrogatory be submitted to the jury could only be for the purpose of an advisory verdict. Before a judgment could be entered the court would have to, as it did, make findings of fact and conclusions of law. (See *Vallejo etc. R.R. Co.* v. *Reed Orchard Co.* (1915) 169 Cal. 545, 555-558 [147 P. 238]; and *Stearns* v. *Los Angeles City School Dist.* (1966) 244 Cal.App.2d 696, 724-726 [53 Cal.Rptr. 482].) We, therefore, conclude that the special verdict of the jury was advisory only as far as these proceedings are concerned, that the so-called judgment entered thereon was not binding, and was not appealable. The cross-defendants' appeals from that judgment must therefore be dismissed, and, as well, their appeals from the orders denying the motions for judgment notwithstanding the verdict.

The judgment must be reversed as to defendant manufacturer for the reasons set forth in part IV. ■ The shipper contends that we should grant it full indemnity and affirm the judgment because of the error in apportioning liability under the law as it existed at the time of judgment. Two things preclude such a decision. In the first place there is a fundamental inconsistency between the court's finding that the negligence of the shipper was passive, and the refusal to relieve it of liability for a substantial portion of the judgment. That inconsistency should be resolved by the trial court if indemnification is to be granted under the law as outlined in part I. We are also mindful that the court in *Li* expressly ruled, ". . . that if any judgment be reversed on appeal for other reasons, this opinion shall be applicable to any retrial." (13 Cal.3d at p. 829.) It is anomalous that a judgment which is apparently predicated upon principles of comparative negligence which presaged *Li*, should have to be reversed, with the possibility that those principles may allow for the apportionment of damages between those whose concurrent negligence proximately caused the injury to the workman in the railroad's car. At this writing no standards have been set approving, much less laying down criteria for such apportionment, but the Supreme Court's invitation to the trial court is still there.

The appeals of the railroad and the manufacturer from the so-called "judgment" on the special verdict, and from the orders denying their respective motions from judgment notwithstanding the verdict are dismissed because the verdict and the record thereof embodied in the "judgment" are merely advisory and interlocutory in nature, are superseded by the findings and judgment of the court, and are not

appealable. The judgment entered November 6, 1973, apportioning the net liability of the shipper is reversed, and the case is remanded for proceedings not inconsistent with this opinion. Each party shall bear one-third of the cost of the record and its own remaining costs of appeal.

Molinari, P. J., and Elkington, J., concurred.